**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| DARRELL CARPENTER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2:21-cv-02053-SHL-atc |
| | ) | |
| MIKE PARRIS, | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER MODIFYING THE DOCKET, DENYING PETITION PURSUANT TO
28 U.S.C. § 2254, DENYING A CERTIFICATE OF APPEALABILITY, CERTIFYING
THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH, AND DENYING
LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Before the Court are the amended Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("Amended § 2254 Petition"), filed by Petitioner Darrell Carpenter, Tennessee Department of Correction ("TDOC") prisoner number 383212, who is currently incarcerated at the Morgan County Correctional Complex ("MCCX") in Wartburg, Tennessee (ECF No. 12); and the Answer to Petition for Writ of Habeas Corpus ("Answer"), filed by Grady Perry, the warden of the prison in which Carpenter was previously confined (ECF No. 22).[1]  For the reasons stated below, the Court **DENIES** the Amended § 2254 Petition.

---

[1] The Clerk is directed to modify the docket to reflect Carpenter's current address, which was obtained from the TDOC's Felony Offender Information, *see* Tennessee Department of Correction, *https://foil.app.tn.gov/foil/search.jsp* (last visited Mar. 18, 2024), and to mail a copy of this order and the judgment to him at that address.   The Clerk is further directed to substitute MCCX Warden Mike Parris for Perry as respondent.   *See* Fed. R. Civ. P. 25(d).

## I.  BACKGROUND

### A.  State Court Procedural History

On November 29, 2007, a grand jury in Shelby County, Tennessee returned a single-count indictment charging Carpenter with the second-degree murder of Dedrick Campbell.  (ECF No. 19-1 at PageID 71–72.)   A jury trial commenced in the Shelby County Criminal Court on April 5, 2010.  (*Id.* at PageID 76.)   On April 7, 2010, the jury returned a guilty verdict.  (*Id.* at PageID 78; ECF No. 19-3 at PageID 262–63.)   At a hearing on May 18, 2010, the trial judge sentenced Carpenter to a term of imprisonment of twenty years to be served at 100% as a violent offender. (ECF No. 19-4 at PageID 274.)   Judgment was entered on May 18, 2010.  (ECF No. 19-1 at PageID 81.)   The Tennessee Court of Criminal Appeals ("TCCA") later affirmed.  *State v. Carpenter*, No. W2012-00947-CCA-R3-CD, 2013 WL 5739753, at *4 (Tenn. Crim. App. Oct. 17, 2013) ("*Carpenter I*").

On or about December 16, 2010, Carpenter filed a *pro se* Petition for Post-Conviction Relief in the Shelby County Criminal Court.  (ECF No. 19-12 at PageID 376–401.)   After an evidentiary hearing where trial counsel testified at length, the post-conviction court granted Carpenter a delayed appeal and dismissed his remaining claims.  (*Id.* at PageID 405–06.)[2]   After the conclusion of the direct appeal, Carpenter filed his Amended Petition in Support of Petition for Post Conviction Relief on or about April 1, 2016.  (*Id.* at PageID 412–22.)   Hearings on the post-conviction petition were held on February 8, February 22, and April 5, 2019.  (ECF Nos. 19-14, 19-15, 19-16.)   At those hearings, Carpenter was *pro se*.   The post-conviction court denied relief

---

[2]  The record on this aspect of the post-conviction is not before this Court, although, as addressed *infra*, the TCCA relied on that testimony to deny relief on the post-conviction appeal.

on June 28, 2019 (ECF No. 19-12 at PageID 445–54.), and the TCCA affirmed, *Carpenter v. State*, No. W2019-01248-CCA-R3-PC, 2020 WL 5626233, at *9 (Tenn. Crim. App. Sept. 18, 2020) ("*Carpenter II*").

In its opinion on direct appeal, the TCCA summarized the evidence introduced at trial:

At trial, David Young testified that the victim, Dedrick Campbell, knocked on the front door of his home located at 1040 Lewis in Memphis on July 10, 2007, in the late afternoon.   The victim wanted to borrow Mr. Young's cell phone.   Mr. Young complied, handing his phone to the victim.   The victim took the phone to the front porch of the home.   He was seen talking on the phone on the front porch of the home by both Mr. Young and Steven Moore.

Mr. Moore was walking down the street on the afternoon of July 10 around the same time the victim was on Mr. Young's front porch talking on Mr. Young's cell phone.   He testified at trial that he witnessed [Carpenter] and another man walk up to the victim at the home at 1040 Lewis.   Mr. Moore was far enough away that he could not hear what the men discussed during a conversation that lasted approximately ten minutes.   Mr. Young went onto the porch at some point during the conversation between the three men to see if the victim still had his cell phone. He observed [Carpenter] talking to the victim.   Mr. Young went back into the house and sat on the couch.

At the conclusion of the conversation, Mr. Moore observed [Carpenter] turn as if to walk away, then turn back toward the victim and fire a shot.   The shot hit the cell phone that the victim was holding in his hand.   The victim walked toward [Carpenter and] was shot twice in the chest.   At that point, the victim turned to run toward the front door of the home.   The victim was shot several times in the back. He died as a result of multiple gunshot wounds.

Mr. Young heard the gunshots from inside the home.   He looked out the window and saw the victim running toward the house then saw the victim change directions and run.   Mr. Young went to his bedroom to call 911.   From this vantage point, he saw [Carpenter] running down the street.   Mr. Young stated that he did not see anything in [Carpenter's] hands while he was running.

Mr. Young exited his home after he got off the phone with 911.   The police were already on the scene.   Mr. Young saw the victim lying on the sidewalk and his cell phone on the steps.   The phone had a bullet hole through it.

The first officer on the scene, Richard Rouse of the Memphis Police Department, heard shots fired in the area of Lewis and Brown.   He saw someone

3

run across the street but he was, at that time, unaware of the situation.   As he got closer to the scene, he saw the victim lying partially on the curb and several men nearby.   Officer Rouse asked these men to identify the perpetrator.   He was told that the shooter was on the run.   Officer Rouse ran in the direction of the shooter but was unable to locate a suspect.

*Carpenter I*, 2013 WL 5739753, at *1–2.

### B.  Carpenter's § 2254 Petition

On December 28, 2020, Carpenter filed a *pro se* petition pursuant to 28 U.S.C. § 2254 in the United States District Court for the Middle District of Tennessee, which was transferred to this district and docketed on January 25, 2021.   (ECF Nos. 1, 5.)   The next day, United States District Judge John T. Fowlkes, Jr.[3] directed Carpenter to file an amended petition on the official form. (ECF No. 7.)   In March 2021, Carpenter filed his Amended § 2254 Petition, which was accompanied by a legal memorandum.   (ECF Nos. 12, 12-1.)   The Amended § 2254 Petition presents the following claims:

1.     "The evidence at Petitioner's criminal trial was insufficient to sustain Petitioner's conviction" (ECF No. 12 at PageID 17; *see also* ECF No. 12-1 at PageID 29–37); and

2.     "Petitioner was denied effective assistance of counsel in violation of U.S. Const. Am. 6" (ECF No. 12-1 at PageID 19; *see also id.* at PageID 29, 38–47).

The Court then directed the Warden to file the state court record and a response to the Amended § 2254 Petition.   (ECF No. 13.)   The Warden filed the record on May 28, 2021, and his Answer on June 25, 2021.   (ECF Nos. 19, 22.)   Carpenter did not file a reply.

---

[3] On November 10, 2021, Judge Fowlkes recused himself and the matter was assigned to the undersigned judge.   (ECF Nos. 23, 24.)

## II.  ANALYSIS

### A.  Sufficiency of the Evidence (Claim 1)

In  Claim 1,  Carpenter  complains  that  the  evidence  was  not  sufficient  to  sustain  his

conviction.   The factual basis for this claim is as follows:

> The only eye-witness to the shooting was Steven Moore, who claimed that the *first*
> gunshot hit the cellphone the victim was holding; *two* shots hit the victim's chest;
> and *two* shots hit his back.   However, the physical facts of the medical examiner
> proved that *one* shot entered the victim's chest, and *four* entered his back.   There
> was insufficient evidence to corroborate Mr. Moore's testimony, and that he heard
> *and* saw the shooting.   There were *two* possible shooters.

(ECF No. 12 at PageID 17.)   Carpenter emphasizes that he does not claim that Moore committed

perjury.   (ECF No. 12-1 at PageID 30–31.)   Instead, he argues, "[i]t was incumbent upon the

State court, on direct appeal, to review the evidence and to determine whether it was sufficient to

uphold  [his]  conviction."   (*Id.* at PageID 31.)   In  that regard,  "the  State  court  should  have

disregarded  any  false  or  forensically-proven  impossible  evidence  that  was  presented  at  [his]

criminal trial."   (*Id.*)

In *Jackson v. Virginia*, 443 U.S. 307, 324 (1979), the Supreme Court held that, "in a

challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled

to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational

trier of fact could have found proof of guilt beyond a reasonable doubt."   In evaluating a *Jackson*

claim, a federal court should review the record "in the light most favorable to the prosecution."

*Id.*   The State is not required "to rule out every hypothesis except that of guilt beyond a reasonable

doubt . . . ."   *Id.* at 326.   "[A] federal habeas corpus court faced with a record of historical facts

that supports conflicting inferences must presume—even if it does not affirmatively appear in the

record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."   *Id.*

"[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."   *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts."   *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam) (internal quotation marks omitted).   Credibility determinations are reserved for the trier of fact and are "generally beyond the scope of habeas review."   *Moreland v. Bradshaw*, 699 F.3d 908, 918 (6th Cir. 2012) (internal quotation marks and alteration omitted).

Carpenter challenged the sufficiency of the evidence on direct appeal.   (ECF No. 19-7 at PageID 326, 330–32.)   Specifically, Carpenter argued that Young testified that he saw Carpenter running down the street but saw no weapon in his hand.   No weapon or bullet casing was found at the scene of the crime.   Moore and Young both testified that they saw a third man with the victim and Carpenter.   Both Carpenter and the victim attempted to flee, but the third man did not. (*Id.* at PageID 332.)   Carpenter submitted that "this odd behavior of the third man is enough to cast reasonable doubt on the guilt of [Carpenter]."   (*Id.*)

The TCCA denied relief, reasoning as follows:

Viewing the evidence in the light most favorable to the State, the proof established that the victim was standing on Mr. Young's porch.   Both Mr. Young and Mr. Moore saw [Carpenter], the victim, and a third man having a conversation outside Mr. Young's home.   Mr. Moore then saw [Carpenter] shoot the victim.   The jury obviously accredited the testimony of both Mr. Young and Mr. Moore herein to establish [Carpenter's] identity as the perpetrator of the offense.   [Carpenter] is not entitled to relief.

*Carpenter I*, 2013 WL 5739753, at *4.

Carpenter properly exhausted a claim that the evidence is insufficient to establish that he was the person who shot the victim.   Where, as here, a state prisoner's claim has been adjudicated on the merits in state court, a federal court can issue a writ only if the adjudication:

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).   The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential standard," which "demands that state-court decisions be given the benefit of the doubt."   *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted).

A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts."   *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).   "[A] run-of-the-mill state-court decision applying the correct legal rule . . . to the facts of a prisoner's case" does not "fit comfortably within § 2254(d)(1)'s 'contrary to' clause."   *Id.* at 406.   Here, although the TCCA did not cite *Jackson*, it applied the correct legal rule from Tennessee cases applying *Jackson* and, therefore, the "contrary to" clause is inapplicable.   *Carpenter I*, 2013 WL 5739753, at *3.

An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case."   *Williams*, 529 U.S. at 413.   The state court's

application of federal law must be "objectively unreasonable" for the writ to issue.  *Id.* at 409.   It is not sufficient for a habeas court, in its independent judgment, to determine that the state court decision applied clearly established federal law erroneously or incorrectly.  *See Renico v. Lett*, 559 U.S. 766, 773 (2010).

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington v. Richter*, 562 U.S. 86, 103 (2011).   Carpenter does not contend that the TCCA's decision was an unreasonable application of *Jackson v. Virginia*.

"[W]hen a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, . . . [t]he prisoner bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'"   *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(e)(1)).   A state court's factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion.   *Wood v. Allen*, 558 U.S. 290, 301 (2010).

In his legal memorandum, Carpenter argues that the TCCA's decision was based on an unreasonable determination of the facts.  (ECF No. 12-1 at PageID 29.)   Carpenter assumes, incorrectly, that the TCCA was obligated to disregard some of the testimony presented at trial.  (*See id.* at PageID 30–31.)   A habeas court does not conduct a *de novo* review of the record.   *See Pinchon v. Myers*, 615 F.3d 631, 643 (6th Cir. 2010).   Instead, a habeas court's review of the sufficiency of the evidence is doubly deferential:

> When reviewing whether the state court's determination was "objectively unreasonable," we engage in a two-step analysis.   First, we ask whether the evidence itself was sufficient to convict under *Jackson*.   The inquiry ends if we

8

determine that there was sufficient evidence to convict . . . .   But even if we were to reach the conclusion that the evidence was insufficient to convict, we would then have to apply . . . deference and ask whether the state court was "objectively unreasonable" in concluding to the contrary.   The law therefore commands deference at two levels.

*Id.* at 644–45 (internal citation and quotation marks omitted).

Carpenter does not dispute that Moore heard gunshots, but contends that it is not believable that he saw Carpenter shoot the victim because he testified—partially erroneously—that two bullets hit the front of the victim.  (*Id.* at PageID 31.)   The medical examiner testified that one bullet entered the victim's chest.  (ECF No. 19-3 at PageID 237, 246.)   Four bullets hit the victim's back.  (*Id.* at PageID 239–40.)   However, it is the responsibility of the jury, not the reviewing court, to assess the credibility of witnesses.   The mere possibility that Moore might be partially wrong about where a bullet struck the victim, or how many bullets struck the victim, does not require the jury or the TCCA to disregard Moore's testimony about what he saw.   The jury's decision to credit Moore's testimony that he saw Carpenter shoot the victim was not objectively unreasonable.  *See Coleman*, 566 U.S. at 651.

Claim 1 is without merit and is **DISMISSED**.

**B.  Ineffective Assistance of Counsel (Claim 2)**

In Claim 2, Carpenter complains that his trial counsel, Anne Tipton, rendered ineffective assistance.   Specifically, Carpenter claims that Tipton (a) "was deficient in investigating the 911 calls"; (b) "was deficient in failing to impeach Mr. Young with the 911 chronology"; (c) "was deficient in failing to object to prosecutorial misconduct; particularly the presentation of Mr. Young's testimony about calling 911 and evidence surrounding the cell phone"; and (d) "was deficient in failing to object to the crime scene photographs or cell phone based on the absence of

a photograph of the cell phone." (ECF No. 12-1 at PageID 28.) Carpenter also argues that (e) "[t]he State failed in its duty to preserve or produce the cell phone being used by the victim." (*Id.*)

### 1. 911 Chronology (Sub-Claims (a)–(c))

Carpenter's theory was that the 911 caller was Mondie Phillips, not Young, and that the victim made another 911 call from the landline inside the house shared by Phillips and Young. At the post-conviction hearing, Ruth Murray, the custodian of records for 911 tapes and background-event chronologies, authenticated a 911 background-event chronology. (ECF No. 19-14 at PageID 486; *see also* ECF No.19-17 at PageID 604–05 (event chronology).) Murray was not, however, asked to interpret the document; instead, Carpenter assumed that he was reading it correctly. The document reflects a 911 call from 1040 Lewis Street at 6:14 p.m. The caller is listed as MONDIE, PHYLLIS. (ECF No. 19-17 at PageID 604.) Murray testified that the name "MONDIE, PHYLLIS" ordinarily would reflect the name of the 911 caller. (ECF No. 19-14 at PageID 486.) Some 911 callers are anonymous or give false names. (*Id.*) 911 does nothing to verify that the name given is correct. (*Id.* at PageID 487.) The event comment stated "DEDRICK SHOT." (ECF No. 19-17 at PageID 604.) A later comment recorded by a different 911 operator at 6:16 p.m., said "COMP ADV SOMEONE IN TREATENING [sic] HIM AND HUNG UP, VM ON CB," which means victim on callback. (*Id.* at PageID 605; *see also* ECF No. 19-14 at PageID 491 (same).) Murray testified that the same number was used for both calls. (ECF No. 19-14 at PageID 491–92.)

Phyllis Mondie testified that she lived at 1040 Lewis on July 10, 2007. (*Id.* at PageID 495.) She also was at home when the shooting occurred. (*Id.*) Mondie testified that she was not the person who called 911. (*Id.*) There was one corded landline in the house. (*Id.* at PageID

10

495–96.)   Mondie knew the victim, Campbell.   (*Id.* at PageID 496–98.)   The number for Mondie's landline was (901) 527-7483, the number listed on the first call on the event chronology. (*Id.* at PageID 497.)   Mondie did not know why the 911 call log listed her name, but she speculated that the caller could have been her boyfriend.   (*Id.* at PageID 496–97.)   Mondie did not know whether Campbell made a telephone call from her house.   (*Id.* at PageID 498.)

David Young testified that he lived at 1040 Lewis on July 10, 2007, and that he was the caller. (*Id.* at PageID 501.)   When confronted with the fact that the call log listed Phyllis Mondie, Young testified that the phone was in her name.   (*Id.* at PageID 502.)   Young confirmed that he told 911 that Dedrick had been shot (*id.* at PageID 502–03), and that he placed a call from (901) 527-7483 (*id.* at PageID 504).   Young testified that the victim did not use the house phone.   (*Id.* at PageID 505.)   According to Young, the house phone was in the bedroom, and he did not let Campbell into the bedroom to use that phone.   (*Id.* at PageID 506.)   Young, instead, had let Campbell use his cell phone.   (*Id.* at PageID 506–07.)   But it was Young that called 911 after Campbell was shot. (*Id.* at PageID 507.)   Campbell never came into the house, and Young never got his cell phone back.   (*Id.* at PageID 507–08.)   No photograph of the cell phone was introduced at trial.   (ECF No. 19-15 at PageID 535–39.)

During the hearing on the motion for a new trial, the defense argued that the victim had called 911 from the cell phone.   (*Id.* at PageID 542.)   The State responded that there was no evidence in the record that a 911 call had been made from the cell phone.   (*Id.* at PageID 542–43.)   Ordinarily, in a murder case where there was a 911 call, the investigator requests a copy of the call.   (*Id.* at PageID 550.)   Here, the prosecutor testified that he did not know how long 911 calls were kept.   (*Id.*)

The prosecutor also did not believe that Young's testimony differed from his pretrial statement.  (*Id.* at PageID 550–51.)   He concluded that neither the 911 call nor the event chronology would have been exculpatory or would have altered the manner in which the case was presented.  (*Id.* at PageID 551–52.)   After being shown the event chronology, he pointed out that "there's two different numbers that showed a call to 911."  (*Id.* at PageID 553; *see also id.* at PageID 554 ("There were two calls within a minute of the shooting apparently from two different phone numbers.").)   The event chronology was the type of information that the State typically produced in discovery.  (*Id.* at PageID 556.)

Anne Tipton, defense counsel, testified that she could not remember whether she had received the 911 event chronology in discovery.  (ECF No. 9-16 at PageID 569–70.)   If she received the document in discovery, she would have used it in her trial preparation and would have brought out any pertinent information at trial.  (*Id.* at PageID 570, 572.)   She believed that she had explored all potentially useful issues.  (*Id.* at PageID 576.)

Although Carpenter's questioning of Tipton at the hearing on the motion did not elicit any useful information, the post-conviction court, in its order denying relief, summarized the testimony of Tipton in a previous post-conviction hearing that is not included in the record before this Court:

> Ms. Tipton got full discovery from the state and obtained funds to hire and [sic] investigator to assist with trial preparation.   Ms. Tipton hired Ms. Hoff to investigate and consulted with her up to and including the time of trial.   Ms. Tipton attempted to get the 911 recording but found out that the time that the recordings are preserved had run.   Ms. Tipton did obtain a printout of the call information and shared it with [Carpenter].   Ms. Tipton did not recall any significant information in the printout that was helpful to the defense.   Ms. Tipton was aware of who made the 911 call and had the police statement of the witness as well as the investigation from the investigator.   Ms. Tipton was clear that at no time was there an allegation that the deceased victim had placed the 911 call.   Ms. Tipton stated that the proof showed that the victim had a cell phone in his hand that was shot by the killer but not that he was placing a 911 call.   Ms. Tipton used everything in her possession

and in her 18 years experience to cross examine the witnesses in the case and felt
that she had developed as much information as could be done.

(ECF No. 19-12 at PageID 448–49.)

Carpenter's claim that his trial counsel rendered ineffective assistance is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which require a showing that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." To establish deficient performance, a person challenging a conviction "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance." *Id.* at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 at 105 (quoting *Strickland*, 466 U.S. at 690).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Richter*, 562 U.S. at 104 (internal quotation marks and citation omitted); *see also id.* at 111–12 ("[T]he question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible

a reasonable doubt might have been established if counsel acted differently. . . .   The likelihood of a different result must be substantial, not just conceivable.") (citations omitted); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out' [a more favorable outcome] to prevail.   Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

The deference accorded to a state-court decision under *Strickland* is magnified when reviewing a claim of ineffective assistance of trial counsel under 28 U.S.C. § 2254(d):

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.   The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S.] at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S., [111,] 123 [(2009)].   The *Strickland* standard is a general one, so the range of reasonable applications is substantial.   556 U.S., at 123.   Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).   When § 2254(d) applies, the question is not whether counsel's actions were reasonable.   The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105 (parallel citations omitted).

### a.  Counsel's Alleged Failure to Investigate the 911 Calls (Sub-Claim (a))

In sub-claim (a), Carpenter alleges that his attorney was deficient in failing to investigate the 911 calls.   Again, Carpenter's theory was that the 911 caller was Mondie Phillips, not Young, and that the victim made another 911 call from the landline inside the house shared by Phillips and Young.   Had Tipton made a proper investigation, she would have called the custodian of the 911 tapes, which would have discredited Young's trial testimony, according to Carpenter.   (ECF No. 12-1 at PageID 38–40.)

14

Carpenter raised the issue in his brief to the TCCA on the post-conviction appeal.

*Carpenter II*, 2020 WL 5626233, at *1. The TCCA denied relief, reasoning as follows:

> [Carpenter] claims that trial counsel was deficient in failing to investigate the 911 chronology and cell phone, which he claims would together have established that the prosecution's witnesses were not being truthful. The post-conviction court found that trial counsel obtained the 911 chronology through an investigator and provided it to [Carpenter] prior to trial. The post-conviction court also found that trial counsel testified that she was aware of the identity of the 911 callers and that there was never an allegation that the victim placed a 911 call. Trial counsel did not believe the chronology was helpful to the defense. Trial counsel recalled that the evidence showed that a cell phone was shot from the victim's hand, but she testified that there was never an allegation that the victim was calling 911 when he was shot. At trial, the State presented Officer Smith's testimony identifying the cell phone with a bullet hole that she collected from the scene of the crime, Mr. Young's testimony that he observed his cell phone with a hole in it, and Mr. Moore's testimony that he saw [Carpenter] shoot the cell phone out of the victim's hand. Trial counsel stated that she investigated the cell phone but that she did not object to the introduction of the cell phone because there was no basis to object to it.
>
> The post-conviction court found that trial counsel was not deficient in investigating the case, and we concur. Trial counsel hired an investigator who located the 911 chronology which [Carpenter] believes contradicts witness testimony. She discussed the chronology with [Carpenter] prior to trial but chose not to use it at trial because she did not believe it was helpful to the defense. The cell phone was made an exhibit at trial and was in a condition consistent with that described by three witnesses. [Carpenter] has not introduced any evidence during the post-conviction proceedings which he can claim trial counsel should have discovered but did not. On the contrary, trial counsel investigated the case and had the relevant evidence, consisting of the chronology and the cell phone, available at trial, but she made a strategic decision not to introduce the chronology or challenge the cell phone. We conclude [Carpenter] has not demonstrated deficiency or prejudice in trial counsel's investigation.

*Id.* at *7.

Carpenter has not established that the TCCA's decision was contrary to *Strickland*. In

fact, it is a run-of-the-mill decision applying the correct legal rule from *Strickland* and, therefore,

the "contrary to" prong of 28 U.S.C. § 2254(d)(1) is inapplicable.  *Carpenter II*, 2020 WL 5626233, at *6–7.

Carpenter also has failed to establish either that the TCCA's decision was an unreasonable application of *Strickland* or that it was based on an objectively unreasonable factual finding. Although Carpenter argues that the victim made a call to 911 from Mondie's landline, the event chronology is far from clear.   The 6:16 p.m. call to which Carpenter refers appears to have been made from "ALT # 901-827-8957," not from Mondie's landline.   (ECF No. 19-17 at PageID 605.) The prosecutor testified that the 911 calls came from different numbers.   No explanation was sought or obtained as to why four separate 911 operators recorded these calls.   Therefore, Carpenter has not satisfied his burden of demonstrating, by clear and convincing evidence, that Young's testimony that he called 911 on the house phone was false.   Carpenter also has not established prejudice in light of the evidence that a cell phone with a bullet hole was recovered and that Moore, not Young, is the witness who testified to seeing Carpenter shoot both the cell phone and the victim.

Sub-claim 2(a) is without merit and is **DISMISSED**.

### b.  Counsel's Failure to Impeach Young (Sub-Claim (b))

In sub-claim (b), Carpenter claims that Tipton rendered ineffective assistance by failing to impeach Young with the 911 chronology.   This claim was exhausted in state court.   The TCCA denied relief for the following reasons:

> We conclude that trial counsel was not deficient in declining to use the chronology to try to impeach Mr. Young.   The evidence at the post-conviction hearing suggested that the chronology listed Ms. Mondie because the telephone line was in her name.   The record does not establish that there were two telephone calls from the same number or that one of those calls was placed by the victim.   [Carpenter's] speculation that the victim, after having been shot five times in the chest with

16

bullets that penetrated his heart, lungs, liver, and pancreas, made his way into Mr. Young's house to use the telephone and then collapsed on the sidewalk outside prior to the arrival of Officer Rouse from a few doors down, is unfounded. Trial counsel was not deficient in determining that the chronology was not beneficial for impeachment because the chronology was consistent with Mr. Young's testimony that he placed a 911 call from Ms. Mondie's landline after the victim was shot. *See Johnson v. State*, 145 S.W.3d 97, 122 (Tenn. Crim. App. 2004) ("[W]e do not discern any clear impeachment value from such a line of questioning because the report was not necessarily inconsistent" with witness testimony). By the same token, [Carpenter] cannot demonstrate prejudice. Even if he had been able to show that the victim or Ms. Mondie called 911, this evidence would not have contradicted the testimony of the State's two eyewitnesses that they saw [Carpenter] shoot the victim and then run. There is no reasonable probability that the outcome of the proceeding would have been different.

*Carpenter II*, 2020 WL 5626233, at *8.

Claim 2 is substantially similar to Claim 1 and is meritless for the reasons previously stated. Young was confronted with the event chronology at the post-conviction hearing, yet persisted in his testimony that he called 911 from the landline after Carpenter had been shot. Young did not know why Phyllis Mondie was listed as the caller but testified that the phone was in her name. Carpenter has not established that the TCCA's decision was an objectively unreasonable application of *Strickland* or that it was based on an objectively unreasonable factual finding. Sub-claim 2(b) is without merit and is **DISMISSED**.

### c. Counsel's Failure to Object to Prosecutorial Misconduct (Sub-Claim (c))

In sub-claim (c), Carpenter complains that his attorney failed to object to prosecutorial misconduct pertaining to the presentation of Young's testimony and the cell phone. Carpenter contends the State allowed Young to testify falsely that he called 911 and that the testimony that the first shot hit the cell phone while the victim was talking was inconsistent with the physical evidence that the only frontal shot hit Campbell in the chest. (ECF No. 12-1 at PageID 42–45.)

17

The TCCA denied relief, noting that "the 911 chronology does not establish that Mr. Young did not call 911, and neither does it establish that the victim did call 911." *Carpenter II*, 2020 WL 5626233, at *8. The chronology "suggests that a 911 call was placed from Ms. Mondie's landline, as Mr. Young testified. Another 911 call, from an unknown caller, also alerted authorities to the shooting." *Id.* The TCCA also held that it was not error to admit the cell phone into evidence given that Moore testified he saw Carpenter shoot it from the victim's hand, Young testified that he observed the cell phone with a bullet hole, and a police officer identified the cell phone, which appeared to have a bullet hole, as having been recovered from the scene. *Id.*

Carpenter has not established that the TCCA's decision was an objectively unreasonable application of *Strickland* or that it was based on an unreasonable factual finding. A prosecutor who knowingly introduces false testimony commits misconduct. *See Brooks v. Tennessee*, 626 F.3d 878, 894 (6th Cir. 2000). "[M]ere inconsistences in testimony by government witnesses do not establish knowing use of false testimony." *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989).

Carpenter argues a particular interpretation of the 911 chronology but has failed to elicit testimony establishing that that interpretation was correct. That the only frontal shot hit the victim in the chest is a fact that counsel was free to argue to counter the testimony that Campbell was talking on the cell phone when he was shot. There are, of course, interpretations consistent with the evidence, such as that Campbell had concluded his call or that he was using the speakerphone. Carpenter has failed to establish that the trial testimony was false and that the State knew that it was false. Sub-claim 2(c) is without merit and is **DISMISSED**.

### 2. Cell Phone and Crime Scene Photographs (Sub-Claims (d)–(e))

Sub-claims (d) and (e) argue that the cell phone should not have been admitted into evidence because no photograph of the phone was introduced.

#### a. IATC Claim (Sub-Claim (d))

In sub-claim (d), Carpenter complains that his attorney failed to object to the crime scene photos and that no photograph of the cell phone was introduced. (ECF No. 12-1 at PageID 44–45.) The TCCA denied relief, holding that, under federal and state law, the State is obligated to produce to the defense only evidence that existed at one point. *Carpenter II*, 2020 WL 5626233, at *8. The TCCA concluded that there was no basis to object to this evidence, reasoning that the crime scene officer "testified that the photographs depicted the scene of the crime after the victim was moved, and she indicted the location of the cell phone in the photographs." *Id.* "Any allegation that the scene had been disturbed would go to the weight of the evidence and not its admissibility, and the alleged absence of a photograph of the cell phone would not make other evidence depicting the scene inadmissible." *Id.* There also was no basis for excluding the cell phone because Young and Moore testified that Campbell was using the cell phone when he was shot and Young and the officer identified the cell phone. *Id.*

Carpenter has not established that the TCCA's decision was an unreasonable application of *Strickland* or that it was based on an objectively unreasonable factual finding. Carpenter cites no clearly established federal law that physical evidence is inadmissible unless there is a photograph of that evidence taken by a crime scene investigator. Sub-claim 2(d) is without merit and is **DISMISSED**.

**b.   The Spoliation of Evidence (Sub-Claim (e))**

In sub-claim (e), Carpenter complains that the State failed to preserve or produce the cell phone that the victim had used.   This sub-claim was rejected on the merits by the TCCA, which explained that "a claim that the Petitioner's rights were violated by the prosecution's failure to produce evidence requires a showing that the State suppressed evidence which was in the State's possession."   *Carpenter II*, 2020 WL 5626233, at *9.   The TCCA continued:

> At the post-conviction hearing, [Carpenter] presented no evidence that there was a photograph of the cell phone that was either withheld from him or lost or destroyed. . . .   [Carpenter] has not demonstrated that the photograph he desires was ever in existence.   Neither has he shown that the cell phone used by the victim was altered, destroyed, or fabricated. . . .   We conclude that [Carpenter] has not demonstrated the existence of a photograph, the existence of another telephone, or an alteration in the state of the cell phone introduced at trial, and he is not entitled to relief.

*Id.* at *9.

Carpenter has not established that the TCCA's decision was contrary to, or an unreasonable application of, any Supreme Court decision or that it was based on an objectively unreasonable factual finding.   Sub-claim 2(e) is **DISMISSED**.

*   *   *   *

Because every claim asserted by Carpenter is without merit, the Court **DENIES** the Amended § 2254 Petition.   The Amended § 2254 Petition is **DISMISSED WITH PREJUDICE**. Judgment shall be entered for Respondent.

## III.   APPEAL ISSUES

Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision denying a § 2254 petition and to issue a certificate of appealability ("COA") "only if the applicant has made a substantial showing of the denial of a constitutional right."   28 U.S.C.

§ 2253(c)(2); *see also* Fed. R. App. P. 22(b).   The COA must indicate the specific issue or issues that satisfy the required showing.   28 U.S.C. §§ 2253(c)(2) & (3).   No § 2254 petitioner may appeal without this certificate.   28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A "substantial showing" is made when the movant demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks omitted).

> Where a district court has rejected a constitutional claim on the merits, the showing required to satisfy § 2253(c) is straightforward:   The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. . . .   When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. . . .

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).   "In short, a court should not grant a certificate without some substantial reason to think that the denial of relief might be incorrect."   *Moody v. United States*, 958 F.3d 485, 488 (6th Cir. 2020).   "To put it simply, a claim does not merit a certificate unless *every independent reason to deny the claim is reasonably debatable*."   *Id.*; *see also id.* ("Again, a certificate is improper if *any* outcome-determinative issue is not reasonably debatable.").

In this case, the § 2254 Petition is meritless for the reasons previously stated.   Because any appeal by Petitioner on the issues raised in his § 2254 Petition does not deserve attention, the Court **DENIES** a COA.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking pauper status on appeal must first file a motion and supporting affidavit in the district court. However, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court.  *See* Fed. R. App. P. 24(a) (4)–(5).   In this case, for the same reasons the Court denies a COA, the Court determines that any appeal would not be taken in good faith.   It is therefore **CERTIFIED**, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith.   Leave to appeal *in forma pauperis* is **DENIED**.[4]

**IT IS SO ORDERED**, this 20th day of March, 2024.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE

---

[4]  If Petitioner files a notice of appeal, he must pay the full $605 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty days of the date of entry of this Order.   *See* Fed. R. App. P. 24(a)(5).